## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| NORMAN DETRICK, et al., | ) | CASE NO.  1:06CV2732 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| 84 LUMBER COMPANY, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

The Court conducted a bench trial in this matter. The parties presented evidence on April 7-11, 14 & 15 of 2008. During the course of the trial, the Court received testimony, documentary evidence and stipulations. Subsequent to the presentation of evidence and in lieu of closing arguments, the parties submitted post-trial proposed findings of fact and conclusions of law as follows:

(1) Plaintiffs Norman and Judy Detrick's supplemental proposed findings of fact and conclusions of law (Doc. No. 210), filed on May 27, 2008;

(2) Defendant 84 Lumber Company, LP's Supplemental Proposed Findings of Fact and Conclusions of Law (Doc. No. 211), filed May 27, 2008.

The following additional responsive briefs were filed:

(1) Defendant's response to Plaintiffs' supplemental proposed findings of fact and conclusions of law (Doc. No. 213), filed June 14, 2008;

(2) Defendant's correction of the record (Doc. No. 215), filed June 27, 2008;

(3) Plaintiffs' responses to defendant's supplemental proposed findings of fact and

conclusions of law (Doc. No. 216), filed July 7, 2008.[1]

The Court now issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. These findings of fact and conclusions of law represent the Court's conclusions after consideration of all of the evidence in light of the pertinent law, the Court's observation of the witnesses, and its evaluation of their demeanor, qualifications, and credibility.

### FINDINGS OF FACT

1. Plaintiffs Norman and Judy Detrick are Ohio residents who sought to build a vacation home in Hovey Township, Pennsylvania. Defendant 84 Lumber is a Pennsylvania Limited Partnership with its principal place of business in Pennsylvania. It does business in the construction industry.

2. In the late summer of 2006, Norman Detrick contacted Tom Foushee, the installed sales manager of 84 Lumber's store in Macedonia, Ohio, about the framing of the home. Foushee and another 84 Lumber employee, Frank Sirna, traveled to the site where the house was to be constructed. While Sirna expressed some reservations about the distance from Macedonia store to the site, Foushee and Sirna both believed that the job could be accomplished in a workmanlike manner.

3. 84 Lumber Company and Norman Detrick then entered into an agreement whereby 84 Lumber agreed to provide rough framing services for the Detricks' vacation residence located in Hovey Township, Pennsylvania, including both a house and a pole barn (a type of detached garage), and the Detricks would deposit $100,000 with 84 Lumber. (Stip. 1.) The terms of the parties agreement regarding 84 Lumber's rough framing work were memorialized in a writing

---

[1] Prior to trial, the parties filed proposed findings of fact and conclusions of law (Doc. No. 102 filed on behalf of 84 Lumber Company, LP and Doc. No. 189, filed on behalf of the Detricks).

entitled "Scope of Work." (Def. Ex. A, hereinafter referred to in text as "Scope of Work.")

4. The Scope of Work provided that 84 Lumber would provide the necessary materials and frame the house pursuant to the architectural plans Norman Detrick provided. (Def. Ex. A.) It also provided that 84 Lumber would complete the job in a reasonable amount of time. (*Id*.)

5. 84 Lumber entered into a subcontract with MAS Construction, which was owned by Mark Schmucker, to provide the rough framing labor. (Stip 7.) (Trial Tr. at 516.)[2]

6. Under the parties' agreement, 84 Lumber assumed the role of "installer" and Norman Detrick assumed the role of "builder." (Def. Ex. A.) As the "builder," Norman Detrick was responsible for, among other items, "all coordination of site, location of materials, location of blocking details, review of layouts and coordination of other trades." (Def. Ex. A.) Norman Detrick's responsibilities were that of a general contractor, while 84 Lumber's responsibilities were that of a subcontractor. Norman Detrick alone was responsible for procuring the roofing, procuring the plumbing, staking out the location where the pole barn was to be placed, and seeing that the concrete foundation was poured. He knew he was responsible for these items. (Trial Tr. at 786.) He thus controlled how and when 84 Lumber ultimately could finish its work. (Trial Tr. at 1053-54.)

7. It is standard in the framing industry for the builder or general contractor to understand how the house is to be framed and to sequence the schedule of each subcontractor to ensure continued construction without periods of inactivity. (Trial Tr. at 913-14, 1049-50.) When Norman Detrick built his first home in Bath, Ohio, he had one of his employees serve as site

---

[2] The Court cites to the trial transcript as filed on the docket, Docket Nos. 201-207. The parties did not request, and the transcripts filed do not include, much of the deposition testimony that was read into the record, nor the voir dire or jury charge. In those instances where the Court cites to testimony by way of deposition, it refers to the deposition transcript that was filed.

superintendent to aid in the construction process.[3] (Trial Tr. at 783.) For the Hovey Township project, however, he did not hire a site superintendent, choosing instead to serve as his own general contractor.

8. It is standard in the framing industry to incorporate a "punch list" process near the end of a project. This process involves reviewing the framing work and adjusting or adding to the framing to remedy any mistakes. Every framing project requires a punch list process because no project is framed perfectly when first erected. The parties agreed in this case that one punch list would be created by both parties and completed prior to the framing inspection. A second would be provided by the township building inspector and would be completed in a timely manner after the inspector inspected the house. Then, and only then, would the builder "sign off" and indicate his assent that the job was finished. (Def. Ex. A.) No final punch list was ever prepared because the framing project was never completed.[4]  (Trial Tr. at 90, 98.)

9. It is standard in the framing industry for the frame inspection by the local building inspector to occur prior to the final punch list, which allows a framer one last chance to cure any deficiencies before turning the frame over to the homeowner. It is also industry standard that this final inspection is not undertaken until the HVAC, the rough plumbing, and the electrical work are finished because those processes affect the frame. To install these "rough trades," the respective subcontractors must cut into the framing. This work often causes damage to the frame, thus requiring repair by the framing subcontractor. (Trial Tr. at 182.) A framer thus cannnot complete a framing job until after the rough trades have been installed.

10. The Scope of Work relies upon the architectural plans for the house drafted by architect Dennis Saxe at the request of the Detricks. (Stip. 5, 22) ("Saxe Plans"). The Saxe Plans

---

[3] Norman Detrick owns his own commercial snow plow business.
[4] In addition, often in the framing industry the term "punch list" is used to include lists of items to be addressed that are compiled throughout the construction of a house, not only ones formulated at the very end of construction.

were the only architectural and/or rough framing design documents provided to 84 Lumber by the Detricks prior to the parties agreeing on the Scope of Work. (Stip. 6.)

11. The Saxe Plans required a monolithic pour of the concrete "thickened slab to 8" under the bearing walls and the concrete basement slab (the "thickened basement slab"). (Stip. 25.) Until the thickened slab was poured, 84 Lumber's work at the site could not have been completed. (Def. Ex. FFF, GGG; Trial Tr. at 1045-59, Leonardi Dep Tr. 63.)

12. Many practical problems occur for framers attempting to frame a house prior to the pouring of the thickened basement slab. The framer does not have a proper place to put the joists and must work in the mud without a concrete floor. The framer can either leave fasteners out of joist hangers or bend them and then have to replace them when the floor is poured. The framer also may have to expend time and labor, as 84 Lumber's subcontractor did in this situation, to construct temporary bracing that will eventually be torn down. The lack of a thickened concrete slab makes the framing job far more difficult and, until poured, impossible to finish. (Trial Tr. at 940-41.)

13. MAS Construction began the rough framing of the house in November 2005. (Stip. 8.) Frank Sirna had previously worked with MAS Construction, and therefore was familiar with its work. (Trial Tr. at 87.) Tom Foushee also had traveled to the site of a house MAS was framing and reviewed Schmucker's work. (Trial Tr. at 161.) Tom Foushee was impressed with the work he reviewed, and 84 Lumber personnel involved in the project believed MAS Construction was competent to perform the framing of the Detrick residence. (Trial Tr. at 161, 283.) MAS was competent to perform the framing of the Detrick residence. In order to allow 84 Lumber and its subcontractor MAS to complete the framing job properly, Norman Detrick should have arranged for the thickened slab to be poured, arranged for the property to be

5

backfilled, and coordinated the scheduling of the other trades to coincide with the framing work. (Trial Tr. at 192-93.) During the time that 84 Lumber and MAS worked on the project, Norman Detrick failed to do any of these tasks. Nevertheless, as an accommodation to its customer in order to get the house under a roof and protect it from the weather, MAS began the framing work. (Trial Tr. at 215.)

14. Working in less than ideal conditions due to Detrick's failure to properly sequence and coordinate the other trades and work on the project, MAS performed approximately 75% of the framing work after 16 days and left the job on December 8, 2006. MAS made some mistakes, as is standard in the industry, in the initial framing.[5] Also, as is standard, the crew planned to return to finish the project and remedy the imperfections once Norman Detrick advised that the basement floor was poured. (Def. Ex. KKK, Trial Tr. at 238, 596.)

15. Frank Sirna's notes indicate that he told Norman Detrick on December 8, 2006, that Detrick needed to pour the basement floor and prepare the site for the pole barn and the crew would then return and finish. (Def. Ex. KKK, Trial Tr. at 94-95.) Regardless, Detrick was the builder, and it was his responsibility as general contractor to coordinate the trades, including contacting the mason to arrange to have the concrete slab poured, so as to ensure 84 Lumber's ability to complete its contractual obligations. It was not incumbent upon 84 Lumber (through Sirna) to direct Detrick in, or remind him of, his duties.

16. MAS and Frank Sirna worked at the site on January 26, 2006, erecting the pole barn. The site for the pole barn was not marked clearly on the property, the property was not excavated to allow for the workers to stand near the edge so that the pole barn could be located in

---

[5] For example, MAS left nails and bolts out of joist hangers. This item is easily finished, by merely putting the nails and bolts in during the punch list process, and MAS intended to do so. It is typical for framers working without a basement floor to leave out fasteners until the floor is poured because if the fasteners are installed before the floor, the fasteners may be bent when the structure is moved to accommodate the building of the load-bearing wall on top of the thickened basement slab. (Maher Tr. 126.)

accordance with the plans' specifications, and the property line was not well-marked. (Trial Tr. at 95-96.) These items were Norman Detrick's responsibility. Again working under very challenging conditions as a result of Norman Detrick's lack of attention to the project, Sirna placed the pole barn as close to the location called for by the print as the property's physical characteristics permitted. (*Id.*)

17. The Detricks did not communicate with 84 Lumber Company about the rough framing work on the Project from February 1, 2006, until May 25, 2006. (Stip. 24; Trial Tr. at 800.) The Detricks knew that 84 Lumber wanted to send a crew out to finish all of the job at one time, as opposed to commuting back and forth repeatedly while 84 Lumber knew the thickened slab still had not yet been poured. (Trial Tr. at 873.) It is industry standard to attempt to accomplish large amounts of the job in one trip, as opposed to commuting back and forth to address small issues when the job cannot be finished. (Trial Tr. at 596, 1049-50.)

18. Norman Detrick was distracted from the project due to personal and family illnesses and professional obligations with his snow plow business from late January 2006 through May 2006. (Trial Tr. at 723-35, 872.) He failed to visit the site between late January and early May. (Trial Tr. at 722.)

19. After months of inattention to the project, in May 2006, Norman Detrick finally regained his focus and requested a meeting with Tom Foushee and Frank Sirna. (Trial Tr. at 728.) On June 2, 2006, Foushee, Sirna, and Norman Detrick met at the house. Norman Detrick requested multiple changes to the work 84 Lumber was to perform. (Stip. 45-52.) The meeting was "business as usual." (Trial Tr. at 729.) Norman Detrick was not unhappy with 84 Lumber's performance at this point, as he acknowledged that he had been absent from the site and had neglected the project while he tended to personal matters from January through May of 2006.

(*Id.*)

20. At the June 2, 2006, meeting, Frank Sirna told Norman Detrick that Detrick needed to pour the basement floor so 84 Lumber could finish its work. Because Norman Detrick did not have a concrete subcontractor scheduled, the parties devised a temporary work around plan, where a monopost was constructed that would allow 84 Lumber to continue framing the house. This plan was only a temporary one, and one that still would not permit 84 Lumber to finish framing the structure without the pouring of the basement floor. (Trial Tr. at 71, 178-79.) It was yet another accommodation by 84 Lumber to continue working at the site even though Detrick still had yet to procure the rough plumbing or basement floor.

21. As it turned out, during the time that Detrick failed to manage the project between January and May of 2006, MAS Construction went out of business.[6] Consequently, Frank Sirna did not have a crew immediately ready to work when the parties developed the temporary work-around plan on June 2. Sirna gathered a crew of workers and notified Norman Detrick on June 20 that his crew would resume work at the site the week of June 26th. (Def. Ex. O.)

22. The crew worked on June 28, June 29, and June 30. At the same time, Norman Detrick finally took bids on HVAC, plumbing, and electrical trades. (Def. Ex. QQQ.) On June 30, Frank Sirna told Norman Detrick that his crew had another job to work upon, so they would not be back to the Detrick house on Monday, July 3. (Trial Tr. at 807.) Even if Sirna's crew had returned to the job site on July 3, they could not have finished the job because the basement floor still had not been poured, nor had the rough trade subcontractors performed their work. (Trial Tr. at 110.)

---

[6] Had Detrick timely arranged for the coordination of work by the other trades, and particularly for the pouring of the concrete slab, MAS likely could have completed the framing in a timely manner, well before MAS went out of business.

23. Apparently frustrated that the crew was not able to accommodate his time schedule now that he had renewed his attention to the project, Norman Detrick then called a meeting for July 5, 2006. 84 Lumber was prepared to come back and finish the job as of this date. (Trial Tr. at 268.) At the meeting, however, Detrick issued an oral stop work order to 84 Lumber Company. (Stip. 29.) He reiterated his stop work order in writing on July 7, 2006, and again on July 11, 2006. (Stip. 30 & 31.)

24. Norman Detrick did not arrange to have the thickened basement slab poured until after he issued his stop work order to 84 Lumber. (Stip. 27.)

25. Following the stop work order, Detrick had two framing inspectors, William Arnold and Fred Dzugan, inspect the incomplete framing job and prepare reports. Both acknowledged that they were inspecting a frame that was incomplete; yet, both inspected the framing job using the standard for a completed job. Not surprisingly, both identified many items they considered deficiencies. (Ptf. Ex. 9, Dzugan Dep. at 25.) Many of the concerns raised were not the fault of 84 Lumber, but were instead related to Norman Detrick's failure to ensure an adequate concrete foundation, adequately coordinate the rough trades, ensure that the architectural plans were structurally adequate, and otherwise ensure that the project kept progressing so the frame did not sit unattended from December 2005 to early June 2006. (Def. Ex. JJJJ.)

26. The testimony of William Arnold and Fred Dzugan is largely not credible because the inspection was performed at a point when all parties conceded that the structure was not finished. (Ptf. Ex. 9; Stip. 37-41; Trial Tr. at 381-82.) This is further exacerbated by the fact that the industry standard is to walk through and repair errors, adjust measurements, and otherwise clean up the job during the final punch list, and 84 Lumber was never allowed to do so. Further, Defendant's knowledgeable and credible expert Arn Goldman identified several issues caused by

9

flaws in the architectural designs and the concrete foundation, not by anything 84 Lumber did or failed to do. (Def. Ex. JJJJ; Trial Tr. at 1052-1074.) 84 Lumber's ability to frame the house was contingent upon Norman Detrick timely securing sound architectural plans and subcontractors. Goldman also reported that of the approximately 20 items that Mr. Arnold had identified that were legitimate framing issues, all could have been repaired during the punch list process, had 84 Lumber been eventually permitted to do so. (Trial Tr. at 1043; Def. Ex. JJJJ.) The number of items, which must be viewed in light of the thousands of steps that must be taken in order to frame a house, was typical of a job that was only 75% complete. (Trial Tr. at 932-34, 1043.) (*See also* Def. Ex. A; Def. Ex. FFF.)

27. Norman Detrick held a meeting at the Pennsylvania house with 84 Lumber personnel on August 8, 2006. (Trial Tr. at 759; Stip. 9.) At Norman Detrick's request, several 84 Lumber employees attended, including 84 Lumber Vice President Rory Leightner. Also at Norman Detrick's request, 84 Lumber brought an independent structural engineer, Stan Koehlinger, to examine the property. In an emotional tirade, Norman Detrick led the 84 Lumber representatives through at least 8 hours of complaints in the summer heat, identifying 193 items he deemed defects in the framing. (Trial Tr. at 816.) 84 Lumber representatives at the meeting attempted to understand Mr. Detrick's concerns. It became apparent, however, that Norman Detrick had not invited 84 Lumber to the site to determine a plan for completing the unfinished project, but instead, was intent on berating and blaming 84 Lumber employees for items which in reality were caused by his months of inattention to and failure to fulfill his obligations relative to the project. (Def. Ex. QQQQ .)

28. At the August meeting, 84 Lumber Vice President Rory Leightner attempted to appease Norman Detrick's complaints by offering to tear the frame down and have it

reconstructed by another subcontractor at 84 Lumber's cost. (Trial Tr. at 454.) Norman Detrick merely replied that 84 Lumber's efforts were a good start. He then produced a document he termed an "exercise" in which he labeled different categories of damages with figures that totaled over $4 million.  (Def. Ex. QQQ.)

29. After the meeting, 84 Lumber representative Rich Maher immediately went home and developed a plan to address all of Mr. Detrick's concerns at 84 Lumber's cost, even if they were not 84 Lumber's responsibility. (Trial Tr. at 942-43; Def. Ex. SS.)

30. All of the issues were repairable. (Trial Tr. at 932.) 84 Lumber would have performed all of its obligations but for Norman Detrick's failure to procure the concrete slab, failure to stake out the proper location for the pole barn, failure to procure the rough plumbing and other trades, and failure to adequately supervise the job as the general contractor.

31. 84 Lumber repeatedly requested that Norman Detrick allow an 84 Lumber crew to return to finish the job after Detrick poured the concrete basement floor. Detrick refused to allow 84 Lumber representatives back onto the property. He then had the entire structure demolished and rebuilt by George Ford Construction beginning August 21, 2006. (Stip. 34 & 43.)  The residence was constructed with a new design and was substantially changed from the residence 84 Lumber originally agreed to frame. The deck was reconfigured, additional stairs were added, and the overall square footage of the residence was increased. (Def. Ex. KKKK; Trial Tr. at 1350-52.)

32. 84 Lumber would have finished the project, including changing items to Norman Detrick's satisfaction, but for Norman Detrick issuing a stop work order and prohibiting 84 Lumber from performing work on the project after July 5, 2006. 84 Lumber had a plan for addressing the issues raised in Arnold's report, including the use of non-galvanized nails on the

11

deck where galvanized nails should have been used. (Trial Tr. at 995-96.)

33. A reasonable time had not yet passed when Norman Detrick issued the stop work order, as he had not yet procured the thickened basement slab, supplied 84 Lumber with necessary information regarding specifications, secured the rough plumbing, and otherwise coordinated the trades that would allow 84 Lumber to frame the rest of the house properly.

34. 84 Lumber typically refunds the amount left in a customer's account when a job is finished. The Detricks, however, prevented 84 Lumber from finishing the job. When the relationship broke down and it appeared that the matter was becoming a legal one, their account still contained $2,194.03, which has not been refunded to them. (Trial Tr. at 21.)

35. In October 2006, the Detricks filed this suit against 84 Lumber, claiming, *inter alia*, breach of contract, quantum meruit, and violations of the Ohio Consumer Sales Practices Act.[7] (Doc. No. 1, Ex. A.) 84 Lumber counterclaimed for defamation based on statements Detrick made on his website, including

> (1) "84 Lumber began the work and then abandoned it without explanation. Time elapsed and the workers did not return and again, no explanation was given."
>
> (2) "A project that was to take 3 to 5 weeks was started and later abandoned leaving 193 documented and confirmed errors, many of them structural, and an incomplete project after 280 days!"
>
> (3) "However, only a few days into the return to work, the project was again abandoned without explanation."

A jury found that Norman Detrick made these statements about 84 Lumber, that they were false, and that he made them with actual malice.

---

[7] The Detricks originally filed this suit in the Summit County Court of Common Pleas. 84 Lumber removed the case to this Court on diversity grounds because it is a Pennsylvania Limited Partnership with its principal place of business in Pennsylvania, while the Detricks are Ohio residents who sought more than $75,000 in damages.

## CONCLUSIONS OF LAW

**Breach of Contract**

1. Under Ohio law, a breach of contract claim requires a *prima facie* showing of the following elements: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Thomas v. Publishers Clearing House*, 29 F. App'x. 319, 322 (6th Cir. 2002) (citing *Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (2nd Dist. 1994)). Breach by the defendant is the failure, without legal excuse, to perform any promise that forms a whole or part of the contract. *J&J Schlaegel, Inc. v. Bd. Of Trs.*, No. 2005-CA-31, 2006 Ohio 2913 at *P44 (Ohio Ct. App. 2nd Dist. 2006) *citing Nat'l City Bank of Cleveland v. Erskine & Sons*, 158 Ohio St. 450, at ¶1 of syllabus (1953).

2. 84 Lumber promised to provide the rough framing of a house upon the passage of a reasonable time. 84 Lumber did not fail to perform its obligations because a reasonable time had not yet passed.

3. 84 Lumber's failure to finish the job also has a legal excuse. A party who prevents another party to a contract from performing according to its terms cannot later recover damages for failure to perform. *See Carrocce v. Shaffer*, No. 96-T-5521, 1997 Ohio App. LEXIS 4845, at *12-13 (Ohio Ct. App. 11th Dist. Oct. 31, 1997) (affirming breach of contract damages award for homeowner who terminated contractor before contractor had completed performance because a reasonable time had passed). Norman Detrick failed to coordinate trades with 84 Lumber's work, failed to pour the thickened slab, failed to ensure the backfilling of the site near the pole barn, and then expressly prohibited 84 Lumber from returning to the premises to finish its job after July 5. All of these items prevented 84 Lumber from performing its contractual obligations, and the Detricks are therefore precluded from recovering under a breach of contract theory. *See*

13

*Fitzpatrick*, 1998 Ohio App. LEXIS 2950, at *9 (When "both parties do not consent to abandoning the contract and one party prevents the other from performing, a breach has occurred.") (citing *Mason Tire & Rubber Co. v. Cumins-Blair Co.*, 116 Ohio St. 554 (1927)).

4. The Detricks' claim for breach of contract also fails because Norman Detrick materially breached the contract. A material breach is a "breach which violates a term essential to the purpose of the agreement." *Fitzpatrick v. Yeauger,* No. 97CA35, 1998 Ohio App. LEXIS 2950, at *9 (Ohio Ct. App. 4th Dist. 1998). A material breach entitles [an opposing party] to "stop performing, which, in essence, terminates the contract." *Nious v. Griffin Constr., Inc.*, No. 03AP-980, 2004 Ohio 4103, at *16 (Ohio Ct. App. 10th Dist. Aug. 5, 2004).

5. "In every express contract for the erection of a building or for the performance of other constructive work, there is an implied term that the owner or other person for whom the work is contracted to be done, will not obstruct, hinder, or delay the contractor, but, on the contrary, will in all ways facilitate the performance of the work to be done by him." *Synergy Mech. Contr. v. Kirk Williams Co.*, No. 98AP-431, 1998 Ohio App. LEXIS 6430, at *11 (10th Dist. Dec. 22, 1998). In addition, "A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." *Id*.

6. The Detricks argue that neither Frank Sirna nor any other 84 Lumber employee ever told them they needed to have the floor poured until June 2, 2006. This Court finds this contention irrelevant. Regardless of whether anyone from 84 Lumber told him he needed to do so, it was Norman Detrick's responsibility under the contract to ensure that the concrete slab was poured, to coordinate the trades, and to otherwise allow 84 Lumber to complete all of its duties under the contract. He failed to do these things, and thus did not meet his contractual obligations,

both explicit and implicit. This breach violated a term essential to the purpose of the agreement, as 84 Lumber could not adequately construct the house. Norman Detrick thus materially breached the contract and cannot recover for breach of contract.

**Consumer Sales Practices Act**

1. The Consumer Sales Practices Act ("CSPA"), Ohio Rev. Code Ann. § 1345.01 *et seq.*, applies to the contents of this sale. *See Collins v. Kingsmen Enters.*, No. 66433, 1995 Ohio App. LEXIS 123 (Ohio Ct. App. 8th Dist. Jan. 19, 1995).

2. The CSPA prohibits unfair or deceptive acts and unconscionable acts or practices by suppliers in consumer transactions, whether they occur before, during or after a transaction. Ohio Rev. Code. Ann. §§ 1345.02-1345.03.

3. The statute itself provides examples of "unfair or deceptive acts." These examples include:

> a supplier representing "that the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription or model, if it is not,"
>
> a supplier representing "that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section; or
>
> a supplier representing "that a specific price advantage exists, if it does not,"

*See* Ohio Rev. Code Ann. § 1345.02. The Ohio Administrative Code also provides additional examples of "unfair or deceptive acts," including "to accept money from a consumer for goods or services ordered by mail, telephone, or otherwise and then permit eight weeks to elapse without (a) making shipment or delivery of the goods or services ordered; (b) making a full refund; [or] (c) advising the consumer of the duration of an extended delay and offering to send

15

the consumer a refund within two weeks if the consumer so requests." Ohio Administrative Code Ann. § 109:4-3-09.

4.  The CSPA also provides for recovery where a supplier commits an "unconscionable act." Ohio Rev. Code Ann. § 1345.03. Subsection (B) of the statute states, "In determining whether the supplier committed an unconscionable act, the following circumstances shall be taken into consideration:

> (1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;
>
> (2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;
>
> (3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;
>
> (4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;
>
> (5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;
>
> (6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment;
>
> (7) Whether the supplier has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.

5. The Detricks have not proven that 84 Lumber committed any unfair or deceptive acts. 84 Lumber did not misrepresent the framing job, as it was incomplete, Norman Detrick

prevented 84 Lumber from completing the job, and any inadequacies in the structure as it stood could have been addressed during the punch list process. Further, within eight weeks of the parties' agreement, 84 Lumber delivered the services it could – approximately 75% of the framing job -- despite being unable to completely finish the job due to Norman Detrick's inaction.

6. The Detricks have not proven that 84 Lumber committed any unconscionable acts. 84 Lumber believed, rightfully, that it could provide a substantial benefit to the Detricks through framing the house. Norman Detrick is a sophisticated businessman who negotiated a transaction at arm's length with 84 Lumber and took on the role of general contractor in the framing job. He could have better protected the Detricks' own interests by performing his duties under the contract, which would have allowed 84 Lumber to complete the framing job, but he failed to do so.

7. There was no deceit in this transaction, as 84 Lumber could have fulfilled its obligations if Norman Detrick would have allowed it to do so. 84 Lumber repeatedly sought to continue working on the project until it was completed to the Detricks' satisfaction. 84 Lumber even offered to appease its customer by paying for the demolition and reconstruction of the house. Such facts do not constitute a CSPA violation. *See Montgomery v. Glasener*, No. 98-CA-49, 1998 Ohio App. LEXIS 6521, at *8 (5th Dist. Dec. 28, 1998) (rejecting a CSPA claim where the "appellee repeatedly attempted to remedy the problem following the argument between the parties, which ended in appellee being ordered from the property by appellants").

8. Even if the Detricks had proven that Tom Foushee's comment that they got a good job with no structural defects was deceptive or unconscionable, the comment was made after Norman Detrick had already issued the stop work order. Thus, the Detricks could not have relied

17

upon the statement to their detriment, and the comment did not proximately cause the Detricks any harm. *Butler v. Sterling, Inc.*, No. 98-3223, 2000 U.S. App. LEXIS 6419, at *13-14 (6th Cir. March 31, 2000) (proximate cause is required to sustain a claim for actual damages under the CSPA); *Motor Credit Ctr. v. Jordan*, 1996 Ohio App. LEXIS 509, at *7-8 (11th Dist. Feb. 16, 1996) (rejecting CSPA claim based on statements that automobile was a "good car" and a "good choice" because a salesman may puff his goods as long as he is merely expressing his opinion, and the appellant had not relied upon the representations where she test drove the vehicle).

9. The Detricks suffered no actual damages because they prevented 84 Lumber from addressing any issues in the framing.

10. The CSPA allows for Defendants to recover attorneys' fees if the Plaintiffs maintained an action that is groundless and was filed in bad faith. O.R.C. § 1345.09(F). A claim is "groundless" if a plaintiff "can offer little or nothing in the way of evidence to support the claim." *Chegan v. AAAA Continental Heating*, No. 75190, 1999 Ohio App. LEXIS 5572, at *17 (8th Dist. Nov. 24, 1999). Bad faith "encompasses more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrong-doing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces the actual intent to mislead or deceive another." *Palmer v. Daniel Troth & Son Builders*, No. 97APE08-1050, 1998 Ohio App. LEXIS 2211, at *16 (Ohio Ct. App. 10th Dist. May 19, 1998). The granting of attorney's fees in a CSPA case is at the court's discretion. *Id*.

11. Although the Detricks ultimately were unable to prove their claim, it cannot be said that they maintained it in bad faith. The Detricks subjectively felt deceived and wronged, and provided an expert report that, although unpersuasive and ultimately defeated by 84 Lumber's experts, did support their claim. Thus, the Court declines to award attorney's fees to 84 Lumber.

**Unjust enrichment**

1. In order to succeed on a claim for unjust enrichment, a plaintiff must prove the following elements: (1) a benefit conferred by the plaintiff upon the defendant; (2) defendant's knowledge of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.,* 12 Ohio St. 3d 179, 183 (1984).

2. Ohio's traditional rule provides that a plaintiff may not recover under a theory of unjust enrichment when an express contract governs the subject matter. *Hughes v. Oberholtzer*, 123 N.E.2d 393, 396 (1956). Ohio courts have recognized recovery on an unjust enrichment theory in the context of construction contracts, though, even when an express contract on the subject exists, where a party has partially, but not substantially, performed. *Id.*; *Ebenisterie v. Marous*, No. 02CV985, 2002 U.S. Dist. LEXIS 26625, at *23-24 (N.D. Ohio 2002) (*citing Blue Ribbon Remodeling Co. v. Meistrich*, 709 N.E. 2d 1261, 1266 (Ham. Cty. Mun. Ct. 1999)); *Murray v. Marbro*, 53 Ohio App. 2d. 1 (12th Dist. 1977); *Kirkland v. Archbold*, 113 N.E.2d 496 (Ohio Ct. App. 8th Dist. 1953). *See also Thermal Master, Inc. v. Greenhill*, No. 86AP-745, 1987 Ohio App. LEXIS 8917, at *14 (Ohio Ct. App. 10th Dist. Sept. 29, 1987); *West Coast Indus. Relations Ass'n. v. Superior Beverage Group*, 127 Ohio App. 3d 233, 239 (7th Dist. 1998); *Spitzer v. Forrester*, No. 7087, 1981 Ohio App. LEXIS 13159, at *9 (2nd Dist. 1981).

3. The Detricks partially performed by paying $108,300 to 84 Lumber. Although its retention of the money could be explained practically by the inception of this lawsuit, 84 Lumber has retained $2,194.03 of Plaintiffs' deposited money without legal excuse. (Def. EX. UUU.)

4. The Detricks are therefore entitled to recovery of $2,194.03.

**Conclusion**

For all of the foregoing reasons, the Court finds that Norman and Judy Detrick have not proven that 84 Lumber is liable for breach of contract or violations of the Ohio Consumer Sales Practices Act. As such, judgment as to these claims is granted in favor of Defendant 84 Lumber Company. The Court further finds that Plaintiffs Norman and Judy Detrick are entitled to recover $2,194.03 from 84 Lumber Company for unjust enrichment.

**IT IS SO ORDERED.**

Dated:  July 21, 2008 _____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**